UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ENERGY ENHANCEMENT SYSTEM, LLC, a Nevada limited liability company,<br><br>　　　　　Plaintiff/Counterdefendant,<br><br>v.<br><br>SUSAN BOWMAN, an individual, and 7B ENERGY WELLNESS CENTER LLC, an Idaho limited liability company,<br><br>　　　　　Defendants/Counterclaimants. | Case No. 2:25-cv-00322-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiff Energy Enhancement System, LLC's ("EES") Motion for Temporary Restraining Order and Preliminary Injunction. Dkt. 2.[1] Upon review, and for the reasons set forth below, the Court GRANTS EES's motion.

## II. BACKGROUND

EES is a wellness technology company. EES's flagship product is the EESystem, a proprietary technology which uses computer screens to deliver what it calls "energy enhancement." EESystem EES licenses the EESystem to spas, wellness clinics, and other similar facilities. Until recently, Defendant 7B Energy Wellness Center, LLC, was one

---

[1] Having reviewed the record, the Court finds the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding delay, and because it finds the decisional process would not be significantly aided by oral argument, the Court decides the Motion on the record and without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

such facility. The demise of the 7B–EES business relationship forms the factual backdrop for this case.

The EESystem comprises three parts: computers and monitors, which display a cascading series of colored bars and glyphs; the software, which generates the cascade; and the security hardware (or "dongles"). Dkt. 2-3. Users sit or meditate in front of the monitors to absorb the radiative energy emitted by the monitors in the hope that the energy will enhance the body's natural ability to heal itself. The computers and monitors are technically the licensee's to keep, but licensees must assign the hardware back to EES prior to resale. The software and dongles, meanwhile, remain the property of EES.

EES asserts that it entered into a licensing agreement (the "Agreement") with 7B and its proprietor, Susan Bowman, whereby 7B and Bowman purchased 24 licenses of the EESystem. EES contends the Defendants tampered with the EESystem through a process called "splitting," which enabled them to display the EESystem on 24 monitors using only 12 computers. EES alleges the Defendants then harmed it in multiple ways: by attempting to sell the remaining 12 computers; by showing other licensees how to split their EESystems; by conflating it with that of a competitor, The Light System ("TLS"); and by "charging" jewelry (placing jewelry in the presence of the EESystem for an extended period), which EES does not endorse.

EES argues that Defendants' violation of the licensing agreement and other interference threatens it with irreparable harm. EES asks the Court to enter a temporary restraining order and preliminary injunction prohibiting Defendants from continuing their unlawful activities. *See generally* Dkt. 2. Defendants responded, arguing that the

MEMORANDUM DECISION AND ORDER - 2

preliminary injunction is moot and should not issue regardless. Dkt. 16. EES has replied. Dkt. 19.

The matter is now ripe for review.

## III. LEGAL STANDARD

"The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008 (D. Or. 2019) (cleaned up). The basic function of a preliminary injunction, by contrast, is to "preserve the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025).

A party seeking a preliminary injunction must clearly demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that the balance of hardships tips in plaintiff's favor; and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor." *Fraihat v. United States Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021).

The Ninth Circuit applies the *Winter* factors on a sliding scale. A party that cannot show a likelihood of success on the merits may nonetheless obtain injunctive relief "if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction

is in the public interest." *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## IV. DISCUSSION

EES argues the Court should enjoin Defendants' continuing breach of the Agreement and their tortious interference with contractual relations. Defendants counter that EES's motion is moot because they have already ceased the conduct complained of, and in any case, EES has not met its burden under *Winter*. Because the Court finds EES has raised—at least—a serious question going to the merits, the burden of hardships tips sharply in EES's favor, and the other *Winter* factors are met, the Court GRANTS EES's Motion.

### A. Mootness

The parties have fully briefed EES's motion for a preliminary injunction. As the purpose of a temporary restraining order is to preserve the status quo until the Court can determine whether a preliminary injunction should issue, *W. Watersheds Project*, F. Supp. 3d, at 1008, the application for a temporary restraining order is DENIED AS MOOT.

Defendants argue that EES's motion for a preliminary injunction is also moot because EES does not allege the Defendants are currently engaging in any *ongoing* unlawful activity. Dkt. 16, at 3–4. What's more, Defendants argue, they have voluntarily ceased using the EESystem, have turned the "dongles" over to their attorney, and are in the process of winding up their business, rendering them totally incapable of committing any unlawful conduct in the future. Dkt. 16, at 4 (citing *Olagues v. Russoniello*, 770 F.2d 791, 794 (9th Cir. 1985)).

Defendants who seek to moot claims for equitable relief based on their voluntary

cessation of challenged acts bear a "heavy burden" of showing that there is no reasonable expectation of repetition. *Olagues*, 770 F.2d at 794–95; *see also Lackey v. Stinnie*, 604 U.S. 192, 204 (2025) (requiring the nonmovant to show that it is "absolutely certain" that challenged conduct will not reoccur).

Defendants have not met that burden here. Even assuming Defendants have ceased using the EESystem, they can resume use at any time. While Defendants point out that the security dongles are in the custody of their attorney, the Defendants' attorney is their agent. If Defendants asked their attorney to return the dongles to them, their attorney would be obliged to obey that directive. RESTATEMENT (SECOND) OF AGENCY § 385 (discussing an agent's duty to obey). And while Defendants allege that 7B Wellness is winding up, it remains active and in good standing with the Idaho Secretary of State.[2] Thus, the Defendants have not shown they are absolutely incapable of resuming the conduct EES challenges. To the extent EES's Motion seeks a preliminary injunction, it is not moot.

## B. Likelihood of Success on the Merits

EES seeks a preliminary injunction based on two claims: one for breach of contract, and another for tortious interference with contract.

### 1. Breach of Contract

The Agreement is governed by Nevada law. Dkt. 2-3, at 3.[3] "Under Nevada law, the

---

[2] As indicated by a business records search of the Idaho Secretary of State's website conducted on October 16, 2025, of which the Court may take judicial notice. *See Franklin Energy Storage One, LLC v. Kjellander*, 2020 WL 2151854, at *1 n.1 (D. Idaho May 5, 2020) (taking judicial notice of the Idaho Secretary of State's online business records).

[3] EES asserts that the contract is governed by Nevada law pursuant to a choice of law provision. Dkt. 2-1,

(continued)

plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Lucky Lucy D LLC v. LGS Casino LLC*, 534 P.3d 689, 691 (Nev. 2023) (cleaned up).

EES argues the Defendants breached the Agreement by using "splitters" to operate 24 monitors on 12 computers, Dkt. 2-1, at 6, pointing to Bowman's social media history as evidence, Dkt. 2-4. To do so, they argue, Defendants must have tampered with the equipment, which would also violate the Agreement. EES further argues that Bowman attempted to sell—and might have already sold—the 12 computers freed up by the splitters to third parties without first reassigning them to EES. Dkt. 2-1, at 6.

EES has raised, at a minimum, a serious question going to the merits. Section 1.1 of the Agreement required Defendants to re-assign sales of EESystem hardware through EES. Dkt. 2-3, at 2. Section 1.3 prohibits duplication of the EESystem. *Id.* Section 1.4 specifies that Defendants were licensed 24 computers and again restricted Defendants from assigning or selling the EESystem. *Id.* Section 1.9(2) required Defendants to maintain the EESystem at EES's "Precise Alignment Specifications." *Id.* at 4. Finally, EES points out

---

at 6. Meanwhile, Defendants cite Idaho law on misrepresentation as a defense to contract formation. Dkt. 16, at 6. Federal courts apply the choice of law rules of the state in which they sit. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The Idaho Supreme Court "has opted in favor of applying the most significant relationship test set forth in the Restatement (Second) of Conflict of Laws." *Seubert Excavators, Inc. v. Anderson Logging Co.*, 889 P.2d 82, 85 (Idaho 1995). Under that approach, "[t]he fact that a contract was entered into by reason of misrepresentation . . . does not necessarily means that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation . . . was responsible for the complainant's adherence to the provision." Restatement (Second) of Conflict of Laws § 201 cmt. c (1971). If a misrepresentation was not responsible for the parties' adherence to the choice of law clause, both the contract's terms and the fraud defense are governed by the parties' selected law. *See id.*, ilus. to cmt. c. Defendants do not argue that any of EES's alleged misrepresentations were responsible for their adherence to the choice of law provision. Dkt. 16, at 6–7. The Court will assume, for the purposes of this motion, that Nevada law governs the agreement's interpretation as well as Defendants' fraud defense.

that Defendants hold out the EESystem as identical to that of competitor TLS. Dkts. 2-8, at 2; 19-2, at 3.

Defendants raise several arguments against a finding of likelihood of success, but none preclude a finding of (at least) a serious question going to the merits. First, Defendants cite pending litigation between EES and a business rival, Robert Religa, regarding whether the EESystem trespasses on Mr. Religa's TLS technology. Dkt. 16, at 5. But that litigation is at the pleadings stage, and the Defendants have not raised Mr. Religa's arguments in their instant briefing. It would, therefore, be improper for the Court to consider it here.

Defendants also argue their alleged breaches occurred after the Agreement lapsed. Dkt. 16, 5–6. They point to a portion of the Agreement providing:

> This License shall be for an initial period of 12 (twelve) months. Should both Parties agree, in writing, to so extend this Agreement, Licensor and Licensee may extend this License at the end of its "Initial Term", in twelve (12) month increments, under the same or similar terms and conditions described herein.

*See* Dkt. 2-3, at 3. However, the Agreement goes on to provide that:

> Licensor has the right to amend agreements at the end of each term. Licensee will automatically renew under current terms as long as licensor does not make amendments.

*Id.* Since Defendants do not assert that EES attempted to make amendments which they then rejected, the Agreement did not lapse at the conclusion of the initial term.

Finally, Defendants argue the Agreement is void because EES induced them to contract through fraudulent misrepresentations. While Defendants might be able to prove a fraud defense, it would require them to prove several contested questions of fact—

MEMORANDUM DECISION AND ORDER - 7

possibly including Defendants' justifiable reliance—by clear and convincing evidence. *See Mendenhall v. Tassinari*, 403 P.3d 364, 369 (Nev. 2017) (noting that fraud in the inducement is a defense to a breach of contract claim); *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004) (stating the elements of fraudulent inducement).[4] Even assuming Defendants have a colorable fraud defense, the burden of proving that defense by clear and convincing evidence is substantial. The Court therefore finds that EES has raised, at a minimum, a significant question going to the merits on its breach of contract claim.

### 2. Tortious Interference with Contract

To succeed on a tortious interference with contract claim in Idaho, the plaintiff must prove "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Zoellner v. St. Luke's Reg'l Med. Ctr., Ltd.*, 937 F. Supp. 2d 1261, 1268–69 (D. Idaho 2013) (citing *Wesco Autobody Supply, Inc. v. Ernest,* 149 Idaho 881, 243 P.3d 1069, 1083 (2010)).

EES presents evidence that it had contractual relationships with other EESystem licensees, *see, e.g.*, Dkt. 2-5; that Bowman knew of those contracts through her membership in a Facebook group for EESystem users, Dkt. 19, at 8; that Bowman

---

[4] The Court's research on this issue remains at a preliminary stage, but it should be noted that Nevada law recognizes separate claims for fraud in the inducement and fraudulent misrepresentation. "A claim for fraud in the inducement includes all the aforementioned elements of fraudulent misrepresentation and the additional element of justifiable reliance upon the misrepresentation." *Alimama Senior Happiness Ctr., Inc. v. 6600 W. Charleston, LLC*, 2025 WL 433014, at *2 (Nev. App. 2025) (unpublished). While the Court is confident that fraud in the inducement is a defense to breach of contract, *see Mendenhall*, 403 P.3d at 369, it has not determined whether fraudulent misrepresentation is a defense.

interfered with those contracts by using the Facebook group to explain how to use the contract-breaching splitters and by telling them she intended to directly resell the freed-up computers to settle her debts, Dkt. 2-4; and that EES's contracts were likely breached to its detriment as a result of Bowman's actions. Dkt. 2-1, at 8.

EES can show a likelihood of success on its tortious interference with contract claim. EES has already shown that it can meet the first element—proving that a contract existed—because it can cross reference the members of the EESystem users Facebook group with its own contract records. EES can also show that Bowman knew of the contracts. Bowman knew she was posting in a group for EESystem users. And EES can point to the Agreement's provisions, which recognize EES as the "Sole Licensor" of the EESystem, to show that Bowman knew the EESystem users were reasonably certain to include EESystem licensees. Dkt. 2-3.

Defendants argue EES cannot show Bowman knew which group members were licensees, and, as a result, it cannot show she "knowingly" interfered with a particular contract. Dkt. 16, at 8. But such knowledge is likely not necessary where, as here, Bowman knew she was interacting with people who contracted with EES. Even if some group members were disinterested observers, Defendants still knew they were interacting with EESystem licensees. EES is likely capable of proving as much at trial. EES thus raises a significant question going to the merits on the issue of knowledge.

Third, it appears likely at this juncture that EES will be able to show Defendants intentionally interfered with EES's license, causing fellow licensees to breach their own agreements with EES. "Interference is intentional when the defendant desires to interfere

or knows that the interference is certain or substantially certain to occur." *Tricore Invs., LLC v. Est. of Warren through Warren*, 485 P.3d 92, 115 (Idaho 2021). As evidence, EES offers a social media post by Bowman describing her success at using splitters to free up computers for resale, and the how-to video she posted describing the process. Dkts. 2-4; 2-2, ¶ 15; 2-7. Bowman was or should have been substantially certain that her acts would impact the licensee group members' relationship with EES.

EES must also show that Bowman's conduct was improper. In determining whether the interference is improper, consideration is given to the following factors:

> 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interest sought to be advanced by the actor; 5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; 6) the proximity or remoteness of the actor's conduct to the interference; and 7) the relations between the parties.

*Haarslev, Inc. v. Muir*, 2025 WL 252701, at *3 (D. Idaho Jan. 21, 2025) (citing *Tricore Invs. LLC*, 485 P.3d at 115). Here, while Bowman's conduct (and perhaps even her motives) could have been benign, EES, the other licensees, and society all have a vested interest in not promoting conduct which would breach the contract. If EES can prove at trial that one of the Facebook group member breached their licensing agreement *after* Bowman's posts, they will have a strong case on causation as well. EES has raised at least a significant question as to the propriety of Bowman's conduct.

Finally, if EES can show that a party breached the contract in reliance on Defendants' advice, it is likely that they will be damaged as a result. The exact measure of such damages would have to be proved at trial, but given the likelihood that EES can show

at least one contract breached because of Defendants' posts, it is likely EES has been damaged as a result.

The Court, therefore, finds EES has raised a serious question going to the merits.

### C. Irreparable Harm

EES argues that it will be irreparably harmed by Defendants' unauthorized use and modification of its proprietary technology, loss of customer relationships, damage to its business reputation, and the technology's suboptimal performance resulting from Defendants' alleged modifications. Dkt. 2-1, at 9.

A party seeking an injunction bears the burden of showing by competent evidence that irreparable harm is likely in the absence of injunctive relief. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013). Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Purely economic harms are generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation." *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). However, "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enters.*, 736 F.3d at 1250.

EES has an adequate remedy at law for its generic breach of contract claims in the form of contract damages. If Defendants used EES's technology without a license, they are liable for the value of the license for the period of infringement. If Defendants received an illicit benefit from their unlicensed use, the Court can order them to disgorge those profits.

MEMORANDUM DECISION AND ORDER - 11

And if Defendants tampered with or sold EES's property, or if they sold their own property in breach of a contractual reassignment provision, they are liable for either the reasonable market value of the property or whatever value they received for the property. EES is not entitled to an injunction on those bases.

However, EES also alleges that Defendants have encouraged other licensees to breach their contracts with EES, publicized the means of doing so online, distributed or attempted to distribute EESystem computers, and used or purported to use the EESystem under the name of its competitor, "The Light System." As evidence, EES presents screenshots of Bowman's social media history, 7B Wellness's website, and 7B Wellness's Facebook page.

In one post, Bowman captions a picture of twelve computer-sized boxes thus: "Today I am mirroring my 24 unit system . . . I will make a video of us doing this and share it with you. I already have several clients that want to buy my extra units. This will help me pay off my debt." Dkt. 2-4. Bowman later posted the promised video, explaining how to use HDMI splitters to free up computers. Dkts. 2-2, ¶ 15; 2-7.

EES further attaches a screen capture of 7B Wellness's website dated June 16, 2025, which states:

> 7B Energy Wellness Center features a technology called The Light System (TLS) formerly known as the Energy Enhancement System (EES). This amazing technology was invented in the 1980's by Robert Religa. In 2001, Sandra Michaels licensed this program and created her own hardware for it and that became the EE System. They are two names for the same technology

Dkt. 2-8, at 2. That website changed a few weeks later. On September 11, 2025, the 7B

Wellness website read:

> 7B Energy Wellness Center features a technology called The
> Light System TLS. This amazing technology was invented by
> Robert Religa in the 1980's and became popular in 2022 under
> the brand name of Energy Enhancement System. Both were
> invented by Robert Religa.

Dkt. 19-2, at 3.

Finally, on January 7, 2025, 7B Wellness posted a picture of jewelry to Facebook

advertising jewelry that had been placed in the EESystem room for two days and nights so

that you could "Take a pinch of EES everywhere you go." Dkt. 2-9.

Taken together, EES presents sufficient evidence to show a likelihood of imminent

substantial damage to EES's brand and business. Bowman's publicization of the methods

to mirror the EESystem, paired with her own admission that she had several clients lined

up to buy her extra units, creates a likelihood that 12 units may be sold to unknown third

parties any day. While there may be an adequate remedy at law for the value of the

computers themselves, there is no adequate remedy for the risk that a purchaser could use

those computers to recreate or endlessly duplicate the EESystem.

Moreover, 7B Wellness's website consistently conflates the EESystem with

competitor TLS, and even credits Robert Religa with the creation of both. Regardless of

whether Defendants are currently using the EESystem, they are representing to the public

that EES is not the true owner of the EESystem. Misattribution of intellectual property

rights is an intangible harm, difficult to calculate or trace. Damages would inadequately

compensate EES for the resulting harm to its reputation.

Finally, "charging" products for resale using the EESystem also constitutes irreparable harm. While the unlicensed sale of these EES-charged goods is remediable at law (because Defendants could pay contract damages or disgorge the value they received), the distribution of the charged goods themselves irreparably threatens EES because it makes a wellness claim EES has not endorsed. The EESystem is ostensibly a wellness enhancing technology. It is marketed based on a hypothesis: that meditation in the presence of the EESystem improves the body's natural healing functions. Whether or not that hypothesis is true, EES has the right to specify that its products are used in a manner consistent with the underlying hypothesis.

When objects are "charged" and then distributed, the people who purchase them do so because they are led to believe they will experience a healing benefit, as they did while in the presence of the EESystem itself. If they do not experience the same benefits, that disappointment may shape their opinion of the EESystem generally, to EES's detriment. As EES has not endorsed the practice of charging—indeed, it specifically prohibits charging in the Agreement—that reputational harm would be Defendants' fault. The "charging" of products thus constitutes irreparable harm as well.

In short, while many of EES's claims are remediable in contract, some are not. Defendants' publicization and encouragement of splitter technology risks unlicensed, untraceable, and potentially unlimited distribution of EES's technology. Regardless of whether Defendants are currently using the EESystem, they continue to conflate it with its competitor TLS. And while selling charged products is remediable at law, impliedly

claiming that people will benefit from charged products—when EES itself does not so claim—is remediable only in equity. These injuries are sufficiently intangible to warrant injunctive relief. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). The Court, therefore, finds EES has met its burden on irreparable harm.

### D. Balance of Hardships

The balance of the hardships tips sharply toward EES. *See Lopez*, 680 F.3d at 1072. Defendants have indicated they will not resume their allegedly unlawful activities, suggesting the burden of complying with an injunction would be slight. EES, by contrast, risks permanently losing control of its intellectual property and brand reputation. Accordingly, the Court finds that the balance of hardships indicates that an injunction would be appropriate.

### E. Public Interest

Finally, an injunction here would be in the public interest because public policy supports vindicating contractual and intellectual property rights. "[T]he public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006). An injunction in this case would promote compliance with contract obligations and would, therefore, be in the public interest.

EES has met all four elements required for the Court to issue an injunction, and the Court is inclined to do so. The Court therefore GRANTS EES's motion as outlined below.

MEMORANDUM DECISION AND ORDER - 15

**F. Injunction Bond**

Defendants ask this Court to require EES to post a $500,000 injunction bond in the event the injunction is later found wrongful. To reach that sum, Defendants appear to assume any injunction would prevent them from engaging in all or most of their business activity. Because the Court narrowly tailors its injunction, a $500,000 bond is unnecessary. The Court ORDERS EES to give security in the amount of $1,000.

## V. CONCLUSION

EES has sufficiently shown, at this early stage, that it can raise a significant question going to the merits on its breach of contract and tortious interference with contract claims. Because it risks imminent irreparable harm, and given the balance of hardships and the public interest, the Court finds that an injunction is appropriate here.

## VI. ORDER

ACCORDINGLY, IT IS HEREBY ORDERED

1.  EES's Motion for a Temporary Restraining Order or in the Alternative for a Preliminary Injunction (Dkt. 2) is GRANTED as follows.

2.  Defendants are ENJOINED from conveying by any means computers now in their physical or constructive possession which are or have been used to deliver the EESystem, and

3.  Defendants are FURTHER ENJOINED from stating or implying in any commercial context that they offer the EESystem or a product that is

substantially identical to the EESystem,[5] and

4.  Defendants are FURTHER ENJOINED from disseminating any products which have been "charged," meaning any physical object which has been placed in the environment of the EESystem for any period of time and which is marketed in connection with EES or the EESystem, and

5.  Defendants are FURTHER ENJOINED from transferring the "dongles" to anyone other than EES's attorney or a third party to which both parties have agreed.

6.  EES is ORDERED to give security in the amount of $1,000.

DATED: November 4, 2025

David C. Nye
Chief U.S. District Court Judge

---

[5] Courts use a four-part test to determine whether commercial speech may be enjoined. Commercial speech can be enjoined if it is false or misleading, there is a substantial governmental interest involved, the injunction directly advances that interest, and the injunction is narrowly tailored to that interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). Defendants represent in briefing that they do not use the EESystem anymore, and the parties do not dispute that the Agreement has been terminated. As a result, any representation by Defendants that they are using the EESystem, either affirmatively or by implication, would be false or misleading. The government has a substantial interest in promoting the honest and informed exchange of services in commerce. *See Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 2025 WL 2448851, at * 17 (9th Cir. Aug. 26, 2025). The injunction would directly advance that interest by prohibiting a particular instance of untrue or misleading commercial speech on a motion by one adversely affected. Finally, the injunction is limited in scope to prohibiting a particular untrue representation and is limited in scope to representations made by Defendants in their commercial capacity. The Court, therefore, finds this preliminary injunction's burden on speech are appropriate and compatible with the First Amendment.